BAXTER, J., Dissenting.
The health dangers of lead in water faucets are significant, but I cannot join the majority’s tortured effort to endorse Proposition 65, the Safe Drinking Water and Toxic Enforcement Act of 1986 (Proposition 65), as a weapon for attacking the problem. Though Proposition 65 includes landmark protections against environmental pollution of drinkable surface and groundwaters, it does not purport to address all means by which contaminants may appear in water drawn from the tap. When fairly considered in context, neither the language of Proposition 65 (Health & Saf. Code, §§ 25249.5-25249.13)[1] nor its interpretive aids support the majority’s conclusion that the chemical transfer of lead from water faucets into tap water is a “discharge or release” of toxin into a “source of drinking water” covered by the statute.
Both the trial court and the Court of Appeal determined, contrary to the majority in this court, that water faucets are not a “source of drinking water” governed by Proposition 65. Because I agree with their conclusions in this regard, I respectfully dissent.
When construing Proposition 65, we must keep several things in mind. First, it was adopted not by the considered processes of the Legislature, but by the all-or-nothing power of the popular vote. The people’s right of initiative is precious, and measures enacted by this means are to be interpreted liberally to honor the electorate’s intent. (Amador Valley Joint Union High Sch. Dist. v. State Bd. of Equalization (1978) 22 Cal.3d 208, 245 [149 Cal.Rptr. 239, 583 P.2d 1281] (Amador Valley).) On the other hand, the voters have no special knowledge of technical meanings the law may attach *316 to particular words or phrases used in such a statute. Moreover, the initiative process provides little opportunity to consider, debate, or modify the language arbitrarily chosen by the drafters of a ballot measure. Extrinsic aids to construction are typically sparse and unreliable. Hence, in ascertaining the purposes of an initiative statute, we should adhere closely to the ordinary, commonsense meaning of its language, as viewed in context and confirmed by the available outside evidence of the voters’ intent. (Id. at pp. 245-246.) In my view, neither the ordinary, commonsense meaning of the words of Proposition 65, nor available extrinsic aids to its interpretation, suggest any application to lead in water faucets.
Second, we must uphold the standards of statutory clarity required by the Constitution. Due process demands that any statute be precise enough to convey its meaning to a person of reasonable intelligence. (E.g., Amador Valley, supra, 22 Cal.3d at p. 244.) But special concerns arise when either civil or criminal penalties are at issue. Violations of Proposition 65 are not criminal in nature, but the statute does impose civil penalties of up to $2,500 per day for each such violation (§ 25249.7, subd. (b)), and the Attorney General’s complaint seeks statutory penalties without limitation.
Though the majority imply otherwise, fundamental fairness dictates that before a law subjects persons to such significant sanctions, criminal or civil, it should give “ ‘fair warning ... in language that the common world will understand, of what the law intends to do if a certain line is passed.’ ” (Mourning v. Family Publications Service, Inc. (1973) 411 U.S. 356, 375 [36 L.Ed.2d 318, 333, 93 S.Ct. 1652], quoting McBoyle v. United States (1931) 283 U.S. 25, 27 [75 L.Ed. 816, 818, 51 S.Ct. 340]; see Hale v. Morgan (1978) 22 Cal.3d 388, 398-406 [149 Cal.Rptr. 375, 584 P.2d 512].) Proposition 65 supplies no such fair warning that it applies to lead in water faucets.
Third, we must interpret any statute in a manner that will avoid absurd applications the adopters cannot have contemplated. (Amador Valley, supra, 22 Cal.3d at p. 245; see also Western Oil & Gas Assn. v. Monterey Bay Unified Air Pollution Control Dist. (1989) 49 Cal.3d 408, 425 [261 Cal.Rptr. 384, 111 P.2d 157].) A conclusion that Proposition 65 applies to lead in water faucets has such mischievous implications. I therefore part company with the majority’s analysis.
I first examine the plain language of the statute. That language makes clear that while the purposes of the measure were broadly stated (Ballot Pamp., Proposed Stats, with arguments to the voters, Gen. Elec. (Nov. 4, 1986) p. 53 (Ballot Pamp.)), the reach of its codified provisions is not *317 universal. Section 25249.5 provides in pertinent part that “[n]o person in the course of doing business shall knowingly discharge or release a [known carcinogen or reproductive toxin] into water or onto or into land where such chemical passes or probably will pass into any source of drinking water . . . .” Section 25249.11, subdivision (d), defines “[s]ource of drinking water ” as “either a present source of drinking water or water which is identified or designated in a water quality control plan adopted by a regional [water quality control] board as being suitable for domestic or municipal uses.”
As the majority suggest, the dictionary defines “source” to include a point of origin, of emanation, or of procurement. (Webster’s Third New Internal. Diet. (3d ed. 1961) p. 2177.) But the voters indicated in several ways what meaning they intended. They identified two “source[s] of drinking water” with which they were concerned—first, “present source[s],” and second, those waters “identified or designated in a water quality control plan ... as being suitable for domestic or municipal uses.” (§ 25249.11, subd. (d).) As the majority concede, the latter portion of the definition necessarily includes only those surface and groundwaters, natural and artificial, which the Porter-Cologne Water Quality Control Act (Wat. Code, § 13000 et seq.; Porter-Cologne Act) places under the planning jurisdiction of regional water quality control boards.
As defendants and their amici curiae suggest, the two prongs of the definition must logically be read in pari materia, the pertinent distinction being temporal. Since the first prong of the definition expressly addresses “present source[s]” of drinking water, the second, by process of elimination, implicitly addresses potential or future “source[s].” And since the “future source” definition is limited to surface and groundwaters within the jurisdiction of regional water quality control boards, the “present source” definition must be similarly confined. This interpretation satisfies the principle of noscitur a sociis, which requires us to adopt a restrictive meaning of a particular item in a series if to do otherwise would make it markedly dissimilar to other items on the same list. (Moore v. California State Bd. of Accountancy (1992) 2 Cal.4th 999, 1012 [9 Cal.Rptr.2d 358, 831 P.2d 798].)
The majority, like the Attorney General, insist that this analysis renders the “present source” language surplusage, because under the Porter-Cologne Act, regional water quality control boards and their plans are concerned with both present and potential surface and groundwater sources of drinking water. Thus, they reason, the second prong of section 25249.11, subdivision (d), must refer to all surface and groundwater “source[s]” of drinking water, whether present or potential. The separate reference to “present source[s],” *318 they suggest, is therefore a further expansion of coverage, and must mean “source[s]” other than surface and groundwaters.
But this construction is implausible for reasons which support the noscitur a sociis principle. First, it would mean that the term “present source[s],” contrary to ordinary understanding, would not encompass all current “source[s]” of drinking water, but only those other than surface and groundwaters. Second, it would signify that while present “source[s]” of drinking water are broadly defined to include all stages and devices through which drinking water now passes, future “source[s]” would be restricted to surface or groundwaters covered by the Porter-Cologne Act. There appears no reason to suppose that the voters wished to distinguish “present” and “future” sources in this manner. Indeed, the electorate could not have intended such a strained and dissonant meaning.
Instead, the definitional purpose of section 25249.11, subdivision (d), most readily distills to the following: The electorate was concerned about both “present” and potential repositories of the public drinking water supply, and wished Proposition 65 to protect both equally. While the “present sourcefs]” of drinking water were already known, so that no extrinsic description was required, some descriptive standard was necessary to determine what potential repositories of a similar kind, not yet in use, should also come within the provisions of Proposition 65. The voters chose to provide that the future or potential repositories protected by Proposition 65 would be those surface and groundwaters designated in regional water quality control plans as “suitable” for domestic or municipal use. Under this reading, if future sources are limited to surface and groundwater respositories, “present sourcefs]” are equally so limited.
The voters also made clear in another way that pollutable surface and groundwater sources, not delivery systems, were the target of Proposition 65. In section 25249.5, they prohibited the “[knowing] discharge or release” of designated toxins “into water or onto or into land where such chemical passes or probably will pass into any source of drinking water.” (Italics added.) By placing the parallel phrases “into water” and “onto or into land” in close juxtaposition, and by qualifying both with the phrase “where such chemical passes or probably will pass into any source of drinking water,” the statute signals that it uses the terms “water” and “land” in the same environmental and geographical sense. In each case, it seeks simply to prevent commerce from polluting the surface and groundwaters which feed or form the present or potential drinking water supply, either directly by release “into” those waters themselves, or indirectly by release “into or onto land” from which such contamination might spread to the same waters.
*319 The limited intent of the “discharge or release” provision of Proposition 65 is further apparent when this provision is compared with the statute’s companion requirement of “exposure warnings.” As to the latter, the statute provides in pertinent part that “[n]o person in the course of doing business shall knowingly and intentionally expose any individual to [a carcinogen or reproductive toxin identified by the state] without first giving clear and reasonable warning to such individual. . . .” (§ 25249.6.)
This language leaves little doubt that the prohibition against unwarned “exposure” encompasses all possible ways in which a business might knowingly cause such exposure, and demonstrates that the drafters knew how to achieve that broad coverage. Under these circumstances, use of more restrictive language in the prohibition against polluting “source[s] of drinking water” must be deemed significant. Had the drafters intended to ban all business conduct which resulted in the knowing contamination of tap water, they presumably would have employed words to that effect.
If the language of Proposition 65 itself were ambiguous, which it is not, the available ballot materials, on which the voters presumably relied for their understanding of the measure, also contravene the expansive construction adopted by the majority. In general, these materials confirm that the voters understood they were prohibiting businesses from knowingly discharging significant levels of identified toxins where those substances might contaminate the surface and groundwaters which form the state’s actual or potential “source[s]” of public drinking water.
Thus, in his analysis of the proposal, the Legislative Analyst summarized the existing laws governing waste disposal, contamination of drinking water, exposure to harmful substances in the workplace, and use of pesticides. He noted that these laws required the enforcing agencies to make judgments about the levels of allowable exposure. Proposition 65, he indicated, would tighten the standards for knowing release by businesses of carcinogens and reproductive toxins into any “source of drinking water.” “[T\he practical effect of the requirement,” he declared, “would be to impose new conditions for the issuance of permits for discharges into sources of drinking water.” (Ballot Pamp., supra, at p. 52, italics added.) Nothing in the Legislative Analyst’s explanation refers to the water delivery system in general, or to water faucets in particular. Indeed, his emphasis on new “permit” standards as “the practical effect” of Proposition 65 focused the voters’ attention on *320 conduct which is regulated by “permit,” i.e., the “dumping” of toxins into the geographical origins and respositories of drinking water [2]
Similarly, the ballot arguments for Proposition 65 are rife with inferences and assumptions that Proposition 65 was concerned with the pollution of geographical “source[s]” of water consumed by the public. For example, the argument in favor of the initiative stated in no uncertain terms: “Effectively, [Proposition 65] tells businesses: Don’t put these chemicals into our drinking water supplies.” (Ballot Pamp., supra, p. 54, italics added.) The argument also stressed that Proposition 65 was intended to toughen the enforcement of existing “toxic laws,” and would sharply increase penalties for “toxic crimes like midnight dumping.” (Ibid.) “These new laws,” the argument insisted, “will not take anyone by surprise. They apply only to businesses that know they are putting one of the [identified] chemicals out into the environment . . . .” (Ibid., second italics in original.)
In their rebuttal to the opponents of Proposition 65, the proponents returned to themes suggesting the measure’s focus on buttressing existing laws against environmental pollution, particularly the discharge of toxic industrial and agricultural byproducts. Thus, they declared: “Who’s really against Proposition 65? [<JQ The big oil and chemical companies are leading the opposition—because they know they would be forced to stop dumping extremely dangerous chemicals into your drinking water .... The existing laws don’t stop them. Proposition 65 will.” (Ballot Pamp., supra, p. 55.) The rebuttal further explained that “Proposition 65 means tougher law enforcement” against “polluters.” (Ibid.) It stated that “Proposition 65 applies to the big businesses that produce more than 90% of all hazardous waste in California (according to official state estimates).” (Ibid., italics added.)
In the context of these explanations, the proponents sometimes made shorthand references to the pollution of “drinking water.” Responding to the opponents’ claims that Proposition 65 “is filled with exceptions” and “hurts farmers” (Ballot Pamp., supra, at p. 54), the proponents also noted that the measure “applies equally” to all California “businesses” with more than 10 employees. (Id. at p. 55.) But these references do not detract from the focus on geographical pollution otherwise apparent. Nothing in the ballot arguments, pro or con, remotely implied that plumbing fixtures installed in homes and businesses are covered “source[s]” of drinking water, or that lead *321 transferred from a faucet to water stored therein constitutes a prohibited “discharge or release” of toxin into such a “source.”[3]
Any ambiguity in the statutory term “source[s] of drinking water” is also resolved against the majority by “the contemporaneous construction ... of the administrative agencies charged with implementing the new enactment.” (Amador Valley, supra, 22 Cal.3d at p. 245.) Soon after the adoption of Proposition 65, and pursuant to its express requirements, the Governor designated the Health and Welfare Agency (HWA) as the “lead agency . . . to implement the provisions of this chapter,” with authority to “adopt and modify regulations, standards, and permits as necessary” to implement and enforce the new law. (§ 25249.12.) In the course of HWA’s 1987 proceedings to adopt implementing regulations, the agency was asked to include a more precise definition of the statutory term “source of drinking water.” HWA declined, but its official reason for doing so, formally stated as part of the rulemaking process, is highly significant.
The agency declared: “This definition is not necessary because this term is already adequately defined in [Proposition 65] at Health and Safety Code section 25249.11, subdivision (d), and any further definition could cause unnecessary confusion. The designations in regional water quality control plans mentioned in [.Proposition 65] provide sufficient guidance on which specific bodies of water are protected under the [initiative statute].” (HWA, amendment to final statement of reasons (1988) adopting Cal. Code Regs., tit. 22, § 12102 et seq., italics added.)
The majority find HWA’s statement of no significance for two reasons. First, they suggest, the statement shows HWA simply “took no position” on the statute’s meaning, and particularly on the question of water faucets, which was not specifically presented for its consideration at that time. Second, they assert, HWA’s reference to regional water quality control plans is not dispositive, because water faucets are beyond the jurisdiction of such plans.
However, in the course of rulemaking, and as the official reason for omitting a regulation, HWA formally declared its assumption, too clear from the statute to require elucidation, that Proposition 65 applies only to geographical sources of drinking water. Nor did HWA’s reference to regional water plans imply an incomplete expression of its views. Under section *322 25249.12, the jurisdiction of HWA, as “lead agency” for implementation of Proposition 65, extended to all of its “provisions,” whether within or without the purview of regional water plans under the Porter-Cologne Act.
Hence, HWA’s statement that regional water quality control plans provide “sufficient guidance” about covered “source[s] of drinking water” cannot be read as limited to matters within the permissible scope of such plans. Rather, the statement reflects HWA’s official position that the “source[s] of drinking water” protected by Proposition 65 are those designated in the regional water quality control plans. This construction is consistent with a fair reading of the statutory language, and thus deserves our deference.[4]
The majority’s extension of Proposition 65 to cover emanations of lead from faucets into tap water has broad, disturbing, and uncharted implications which the voters cannot have considered, and which cause particular concern in light of the potentially onerous statutory penalties. At the outset, it is not clear what constitutes a complete and separate “violation” of the statute in this regard, and thus exposes the violator to a separate penalty. Proposition 65 provides that a violation occurs whenever one knowingly “discharged or released” a covered toxin into a “source of drinking water.” Thus, under the majority’s view of the statutory terms, a faucet manufacturer or seller who knows that his product contains lead may well commit a completed violation every time one of his installed products is turned on. Thus, the manufacturer or seller may be exposed to tens of thousands of penalties each day.
Equally disturbing is the prospect that any covered “person in the course of doing business” would also be exposed to limitless penalties for using faucets in the business with knowledge that they leached lead. Under such circumstances, such a person would presumably commit a violation each time a lead-leaching faucet is turned on in the conduct of the enterprise.
Moreover, even if Proposition 65 has only “prospective” operation, manufacturers, sellers, and business users may incur penalties from the operation *323 of faucets that were legally sold and installed before the statute took effect. A violation of Proposition 65 occurs not by the sale or installation of any fixture, but by a later knowing “discharge or release" of toxins. Hence, a faucet sold and installed before the effective date of Proposition 65 may produce a violation, and thus a penalty, each time it leaches lead into water after the effective date of Proposition 65, if the manufacturer, seller, or business user realizes that the faucet has this dangerous characteristic. Under such catastrophic circumstances, business operators, once apprised that their faucets leach lead, could only forestall the endless potential accumulation of penalties by retrofitting their premises entirely and immediately with lead-free faucets.[5]
Indeed, the bleeding may not even stop there. Under the majority’s theory, there is no principled basis for distinguishing water faucets from any other plumbing fixture which leaches lead while holding water that will ultimately flow from a bathroom or kitchen tap. By analogy to the majority’s reasoning, any such fixture would “release or discharge” a prohibited toxin into a “source” of drinking water. Thus, insofar as a business operator must replace faucets that contain lead, a similar obligation would appear to arise for any other pipes and fixtures on the premises that contain lead.
The voters cannot have intended such results when they enacted Proposition 65. The statute’s focus on “discharge or release” of toxins into a “source of drinking water” was designed to prevent businesses from intentionally contaminating the state’s surface and underground repositories of drinking water; it is not formulated or adapted to combat the dangers of lead emanating from fixtures installed in a home or business. The majority err by their misguided attempt to fit the “square peg” of Proposition 65’s “discharge or release” provisions into the “round hole” represented by the problem of lead-leaching fixtures.
*324 By contrast, other state law is better designed and adapted to combat lead contamination of tap water by private plumbing fixtures. As required by Health and Safety Code section 116880, the Department of Health Services has amended the California Plumbing Code to establish a maximum lead content for pipes and pipe fittings used to convey potable water. (Cal. Code Regs., tit. 24, § 1004, subd. (g).) Moreover, as noted, Proposition 65 itself requires a covered business to warn persons before it knowingly “expos[es]” them to significant levels of identified carcinogens or reproductive toxins, including lead.
For all these reasons, I conclude that by merely manufacturing and selling faucets containing lead, defendants did not “discharge or release” lead into a “source of drinking water” within the meaning of Proposition 65, as charged in the first and second causes of action of the Attorney General’s complaint. Accordingly, the trial court correctly sustained defendants’ demurrer to this portion of the complaint, and the Court of Appeal properly upheld that determination. The judgment of the Court of Appeal should therefore be affirmed.
Chin, J., concurred.
The petition of real parties in interest for a rehearing was denied February 5, 1997. Baxter, J., and Chin, J., were of the opinion that the petition should be granted.

Further unlabeled statutory references are to the Health and Safety Code.

In his brief Official Title and Summary of Proposition 65, the Attorney General described the statute more broadly as imposing restrictions on toxic discharge “into drinking water.” (Ballot Pamp., supra, p. 52.) But the value of this description is limited by its facial inaccuracy, in that it ignores the measure’s reference to “source[s] of drinking water.” The words of the statute, read in their own context, must prevail over an inaccurate secondary description.

The opponents’ attack urged that existing laws were working, that Proposition 65, by contrast, was unworkable and discriminatory, particularly against agriculture, and that the measure would encourage private “bounty hunters” and their lawyers. (Ballot Pamp., supra, pp. 54, 55.)

I am not persuaded to a contrary view by the subsequent “private, unpublished letter” from HWA science adviser Book to the Plumbing Manufacturers Institute (PMI). As the majority indicate, PMI had requested administrative guidelines declaring that plumbing fixtures were exempt from Proposition 65. Book’s response stated that HWA “cannot adopt such a position.” For reasons amply explained by the majority, Book’s letter does not evidence an official view of the agency and does not meet the criteria for judicial deference to a contemporaneous administrative construction. In any event, Book’s letter does not imply HWA’s view that plumbing fixtures were covered. On the contrary, Book commented that “[t]he Agency has never taken the position that the leaching of chemicals from a private plumbing facility into water within the facility constitutes a discharge into a ‘source of drinking water.’ The term ‘source of drinking water’ appears to refer to the geographic sources of water, whether used as a present source of drinking water, or simply designated by a regional water quality control board as suitable for domestic or municipal use.”

One might argue that public officials authorized to bring enforcement actions under Proposition 65 would be unlikely to attack manufacturers, sellers, or business users of faucets in this fashion, but the opportunity will be obvious to private citizens, who may sue for both injunctive relief and penalties if the authorized public officials decline to do so. (§ 25249.7, subd. (d).) Even if penalties recovered by private citizens go to the public coffers, a point not made clear by Proposition 65, their lawyers may still be eligible for hefty fees arising from success in a “public interest” lawsuit. (Code Civ. Proc., § 1021.5.) So the incentive may well exist to ensure that a manufacturer, seller, or business user knows his faucets leach lead, demand enforcement by public officials as the statute requires, then commence a private suit if such enforcement is declined.
Nor is it unrealistic to assume that a court might penalize manufacturers, sellers, or business users for the continuing operation of lead-leaching faucets that were legal when sold and installed. Even if the settlement agreements in this case effectively immunize these defendants from suit by the State of California for faucets they sold before the agreements took effect, the agreements have no greater legal effect.